**TRENK, DIPASQUALE, WEBSTER,
DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Sam Della Fera, Jr. (SD 4840)
Shoshana Schiff (SS 9639)
*Proposed Counsel for Debtors and
Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WRS HOLDINGS, LLC, *et al.* | Case No. 10-28457 (DHS) |
| Debtors. | *\*Motion for Joint Administration Pending* |
| | Honorable Donald H. Steckroth |

### DECLARATION OF CHET DUNICAN IN SUPPORT OF FIRST DAY MOTIONS PURSUANT TO 28 U.S.C. § 1746

**CHET DUNICAN**, pursuant to 28 U.S.C. § 1746, declares as follows:

1.  I am the Chief Operating Officer of WRS Holdings, LLC, WRS, LLC, Woods Restoration Services of Montclair, NJ, LLC, Woods Restoration Services, LLC, Woods Restoration Services of S.C., LLC, Environmental Remediation Concepts, LLC and WRS, Inc. the Chapter 11 debtors and debtors-in-possession (collectively, the "Debtors").

2.  In accordance with the relevant Resolutions filed simultaneously with the Debtors' Chapter 11 petitions, I have been authorized to submit this Declaration in support of the motions (collectively, the "First Day Motions") which have been or will be filed with the Court in connection with the commencement of these Chapter 11 cases and to assist the Court and other parties in interest and understanding the circumstances that precipitated the commencement

of these Chapter 11 cases. Any capitalized term not expressly defined herein shall have the same meaning ascribed to such term in the relevant First Day Motions.

3. The Court has not yet scheduled a hearing on the First Day Motions, wherein the Debtors seek the entry of orders for the following relief**:**

(A) authorizing the Debtors to pay pre-petition wages, salaries, withholding and payroll related taxes for pre-petition periods; directing all banks to honor pre-petition checks for payment of pre-petition employee obligations; and honor workers' compensation and certain employee benefit obligations, pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5);

(B) entry of a Bridge Order and a Final Order (i) prohibiting utility companies from discontinuing, altering or refusing service, (ii) deeming utility companies to have adequate assurance of payment, and (iii) establishing procedures for resolving requests for additional assurance pursuant to 11 U.S.C. §§ 105(a) and 366;

(C) authorizing the Debtors to use continue using existing consolidated cash management system, bank accounts, and business forms; and granting a waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code;

(D) authorizing the Debtors to use cash collateral; and

(E) authorization for joint administration of the Debtors' Chapter 11 cases.

4. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee or trustee has been appointed in this case.

5. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financial condition, and the industry as a whole. If I were called upon to testify, I would testify competently to the facts set forth herein.

6. In my capacity as CEO of each of the Debtors, I am responsible for the general oversight of the Debtors' business affairs and, as a consequence, I have gained detailed knowledge of the Debtors' finances and operations.

7. I am advised by proposed bankruptcy counsel that this Court has jurisdiction over these Chapter 11 cases pursuant to 28 U.S.C. § 157 and that venue of this case and the First Day Motions is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409.

8. In order to enable the Debtors to operate effectively and to minimize the adverse effect of these Chapter 11 filings, the Debtors have requested various types of relief in the First Day Motions filed with the Court.

9. Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the filing of the Debtors' Chapter 11 petitions. Part II sets forth the relevant facts in support of the Debtors' various First Day Motions filed concurrently herewith.

## PART I:  BACKGROUND

### A.    The Chapter 11 Filing

10. On June 16, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States District Court for the District of New Jersey.

11. The Debtor continues to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee or trustee has been appointed in this case.

12. The Debtors maintain all appropriate and required insurance.

**B.     The Debtors' Business, Structure, and Operations**

13.    The affiliated Debtors are engaged in the emergency/insurance restoration business, rebuilding and reconstruction. They share common ownership, officers and a place of business in Wayne, New Jersey, and have a common secured creditor and many common unsecured creditors.

14.    Debtor Woods Restoration Holdings, LLC, a Delaware limited liability company now known as WRS Holdings, LLC ("Holdings"), was formed in November, 2005 to facilitate the purchase of the assets of various related entities. Holdings became the sole member of Woods Restoration Services LLC, a Delaware limited liability company now known as WRS, LLC ("WRS"), and Woods Restoration Services Inc., a California corporation ("WRS California").

15.    Holdings purchased substantially all of the assets of both Woods Restoration Services, Inc., a Connecticut corporation ("WRS, Inc."), and Absolute Cleaning Services LLC, and it also purchased the equity in Woods Restoration Services, LLC, a Florida limited liability company ("WRS Florida"), Woods Restoration Services S.C. LLC ("WRS South Carolina") and Woods Restoration Services of Montclair NJ LLC ("WRS Montclair"). The two remaining Debtors, Environmental Remediation Concepts, LLC and WRS, Inc. similarly were formed in connection the purchase transaction or shortly thereafter. The asset purchase was funded by cash from Holdings, notes to the sellers (Philip Woods, Tim Woods and Marin Woods), and secured financing from MFC Capital Funding ("MFC"). All of the Debtors are obligors or guarantors of the MFC debt.

16.    WRS California, WRS Florida, WRS South Carolina and WRS Montclair each were formed for the purpose of satisfying respective state licensing requirements for entering

4

into construction projects in those states. While they still exist as corporate entities and are necessary to undertake projects in those states, substantially all operations are now conducted by, and substantially all assets and liabilities reside in, WRS.

17. Many construction projects were underway at the time of the asset purchase and WRS Florida was in the process of entering into an approximately $50 million restoration/rebuild contract with several Sunrise, Florida condominium associations related to damage suffered as a result of Hurricane Wilma. The signing of this contract was a significant reason for the purchase of the Florida entity and a material basis for the loan from MFC.

18. Over the past several months, projects have been completed while new construction is limited in the current economic environment. WRS has continued to remain viable by operating at a reduced level, including reductions in payroll and physical locations, but continues to struggle to meet the monthly debt service due to MFC.

19. In addition, the Debtors have been subject to substantial contingent claims related to their construction work and work done by their predecessor companies, liability for which transferred to the Debtors with the equity purchases described above. A significant portion of the emerging contingent liabilities arose under the management of the management team in place prior to January 2009. A new management team was put into place during the early months of 2009. Since January 2009, no new claims/lawsuits have arisen related to work commenced after January 2009. The Debtors estimate that there are potentially several million dollars in contingent liabilities related to construction work done in connection the Sunrise, Florida project alone, some of which already is the subject of litigation in that state. Similar litigation also is pending in New Jersey. Finally, there are several years' worth of contingent liabilities that are as

yet unidentified, but subject to assertion and to which WRS is exposed without insurance coverage.

**C.   Events Leading to Debtors' Chapter 11 Filings**

20.   The Debtors sought bankruptcy protection to address the pending litigation claims, substantial contingent liabilities and debt service issues in a single forum, in order to reduce expense, preserve assets and ensure a more financially stable future.

**PART II.  FACTS IN SUPPORT OF FIRST DAY MOTIONS**

21.   Concurrently with the filing of the Chapter 11 petitions, the Debtors have filed certain Motions and proposed Orders (collectively, the "First Day Orders").  The Debtors request that each of the First Day Orders described below be entered, as each constitutes a critical element in achieving a successful result in the Debtors' Chapter 11 cases for the benefit of all parties in interest.

**A.   Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(A), 507(A)(3) and 507(a)(4): (A) Authorizing the Debtor to Pay Pre-Petition Wages, Salaries, Withholding and Payroll Related Taxes for Pre-Petition Periods; (ii) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; and (iii) Honor Workers' Compensation and Certain Employee Benefit Obligations**

22.   The Debtor employs approximately 52 employees (the "Employees").

23.   The continued and uninterrupted service of the Employees is essential to the Debtors' continuing operations.  To minimize the personal hardship the Employees will suffer if pre-petition Employee-related obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtors, by their Motion, seek authority to: (i) pay all pre-petition Employee claims for wages, salaries, contractual compensation, sick pay, personal pay, holiday pay, other accrued compensation, withholding and payroll related taxes for pre-petition periods; (ii) directing all banks to honor pre-petition checks for payment of pre-

6

petition employee obligations; and (iii) honor workers' compensation and certain employee benefit obligations (collectively, the "Employee Programs").

24. The Debtors also (i) request that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all pre-petition checks and transfers drawn on the Debtors' payroll accounts and to make the foregoing payments, and (ii) seek authority to pay all processing costs and administrative expenses related to the foregoing payments, if any. The Debtors submit that any payments that will be made in connection with pre-petition wages, salary, other compensation and benefit programs will not exceed the sum of $10,000 per employee allowable as a priority claims under sections 507(a)(4) & (5) of the Bankruptcy Code.

      **a.**    **Summary of the Debtors' Pre-Petition Employee Obligations Weekly Wages, Salaries and Other Compensation**

25. The gross average weekly payroll for the Employees is approximately $61,181.49. The Employees are paid on a weekly basis. The Debtors' do not employ the services of a payroll company. All payroll issues are handled by the office staff. The Employees' paychecks are drawn on the Debtors' bank accounts. The next scheduled payroll is Thursday June 24, 2010 for work performed from June 13, 2010 through June 19, 2010. By this Motion, the Debtors seek an order authorizing WRS, LLC to pay all outstanding prepetition wages, salaries and other compensation owed to the Employees in the ordinary course of business.

      **b.**    **Vacation, Sick, Personal Leave, and Holidays**

26. By this Motion, the Debtors seek an order authorizing it, but not directing it, to honor all liabilities to its Employees with respect to vacation, sick pay benefits, personal days and paid holidays that arose prior to the Petition Date and to continue its pre-petition policies

7

with respect to same going forward. The Debtors anticipate that its Employees will utilize any accrued vacation, sick leave or personal days in the ordinary course, without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

      **c.**      **Reimbursable Business Expenses**

27. In the ordinary course of the Debtors' businesses, Employees may incur a variety of business expenses that are typically reimbursed by the Debtors pursuant to its normal business practices (hereinafter, "Reimbursable Business Expenses"). All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtors. By this Motion, the Debtors seek an order authorizing it, but not directing it, to pay all pre-petition Reimbursable Business Expenses.

      **d.**      **Health Insurance Obligations**

28. In the ordinary course of their businesses, the Debtors provide medical, prescription drug, and dental insurance to its Employees. The insurers are Horizon Blue Cross/Blue Shield. The Debtors are current on its insurance premium payments with Horizon Blue Cross/Blue Shield (the "Health Benefits"). By this Motion, the Debtors seek an order authorizing it, but not directing it, to continue Health Benefits.

      **e.**      **Workers' Compensation Obligations**

29. Under the laws of New Jersey, the Debtors are required to maintain workers' compensation policies and programs to provide the Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. Accordingly, the Debtors maintain workers' compensation programs in New Jersey, pursuant to the applicable requirements of local law.

#### f. Payroll Taxes and Deductions

30. The Debtors make weekly transfers to the payroll account at JP Morgan to cover all outstanding tax obligations related to employee and employer payroll taxes. WRS, LLC is responsible for filing and making payments to the appropriate federal, state, and local taxing authorities. The estimated amount of the Debtors' accrued employee and employer payroll taxes as of the Petition Date is for a one-week period. But for these current tax withholdings, the Debtors are current on their payroll tax obligations. By this Motion, the Debtors seek to authority to pay any accrued and unpaid payroll taxes and continue to forward all post-petition payroll deductions to the appropriate parties.

#### g. Authority for Banks to Honor and/or Reissue Checks

31. The Debtors further requests that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay any and all check and transfers drawn on the Debtors' dedicated payroll accounts, whether such checks were presented before, or are presented after, the Petition Date. Accordingly, by this Motion, the Debtors seek (i) authorization for, and/or ratification of, its banks' honoring of pre-petition payroll checks and transfers on or after the Petition Date, (ii) authorization for the banks to process and honor all other checks issued for payments approved by this Motion, and (iii) authorization to reissue checks for payments approved by this Motion where the check therefore is dishonored post-petition.

Document    Page 10 of 14

**B.     Debtors' Motion for a Bridge Order and Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§105(a) and 366**

32.     By this Motion, the Debtors seek entry of (i) a Bridge Order, and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting the Utility Companies from discontinuing, altering or refusing service to the Debtors, except as set forth herein, (b) deeming the Utility Companies adequately assured of future performance on the basis of payment of a two week security deposit (the "Utility Deposit"), and (c) establishing procedures for resolving requests for additional assurance of payment.  The Utility Companies are set forth on Exhibit "A" to that motion.

33.     In the operation of their facilities, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, heat, electricity, garbage, and telephone service.

34.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' Chapter 11 efforts.  Indeed, any disruption to the Debtors' businesses by virtue of the cessation of utility services by the Utility Companies will bring the Debtors' operations to a halt.  If one or more of the Utility Companies refuse or discontinue service even for a brief period, the Debtors' operations would be severely disrupted.  Such an interruption would damage customer relationships, revenues, and profits and would ultimately adversely affect the Debtors' Chapter 11 efforts, to the detriment of their estates, creditors, and employees.  It is therefore critical that utility services provided to the Debtors continue uninterrupted.

C. **Motion for an Order (a) Authorizing Debtors to Continue Using Existing Consolidated Cash Management System, Bank Accounts, and Business Forms; and (b) Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code**

35. By this motion, the Debtors respectfully request entry of an order (a) authorizing the Debtors to continue using their existing consolidated cash management system, bank accounts, and business forms; (b) granting a waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code; and (c) granting such other relief as this Court deems just and equitable.

   a. **Request to Maintain Bank Accounts and Cash Management System**

36. In the ordinary course of their operations, the Debtors maintain a consolidated cash management system (the "Cash Management System") to receive and disburse funds. In order to lessen the disruption caused by the bankruptcy filing and maximize the value of their estates in these Chapter 11 cases, it is vital to the Debtors that they maintain their existing system of managing cash.

37. Many of the Debtors' customers are located out-of-state and have established electronic fund transfer protocols that, if changed, would severely disrupt the Debtors' business operations.

38. Currently, the Debtors have five bank accounts (collectively, the "Bank Accounts"). A listing of the accounts is attached to the Motion as Exhibit "A." Four of the accounts are maintained at JP Morgan Chase, N.A. ("JP Morgan"). The four accounts at JP Morgan are operating/checking (the "Operating Account"), payroll, restricted cash-federal, and a CD used as collateral for Chase credit cards. The balance in the Operating Account regularly exceeds the insured deposits limits of the Federal Deposit Insurance Corporation (the "FDIC"). Finally, WRS, LLC maintains one checking account at First Jersey Credit Union. The balance in

11

the First Jersey Credit Union account may exceed the National Credit Union Administration ("NCUA") limit. Both JP Morgan and First Jersey Credit Union are financially stable banking institutions, and insured by the FDIC and NCUA, respectively.

39. In the ordinary course of their businesses, the Debtors receive, deposit, and issue checks, wire transfers, and ACH's into and out of their respective accounts. Funds are routinely received from customers for payment of goods and services and are disbursed for employee payroll and taxes and various accounts payable to third-party vendors, suppliers, and outside contractors. The Debtors also routinely make inter-company transfers of funds between the Bank Accounts by electronic transfers.

40. The Cash Management System includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtors maintain and will continue to maintain detailed and accurate accounting records reflecting all transfers of funds and the Debtor on whose behalf such funds are transferred. The Debtors' cash management procedures are ordinary, usual, and essential business practices. They are similar to those used by other corporate enterprises and provide significant benefits to the Debtors, including the ability to (a) accurately and immediately report receipts and expenditures; (b) control corporate funds centrally; (c) ensure the availability of funds when necessary; and (d) reduce administrative expenses by centralizing the movement of funds.

    **b.**    **Request for Authorization to Maintain Existing Business Forms**

41. By this Motion, the Debtors also seek authority to continue to use their pre-petition business forms, including, but not limited to, letterhead, invoices, checks, et cetera (collectively, the "Business Forms"), without reference to their status as debtors in possession.

Requiring the Debtors to immediately print new business forms will be burdensome, expensive, and disruptive, particularly in light of the nature and scope of the Debtors' operations.

42. The Debtors submit that the authorization to use the Business Forms will facilitate smooth and orderly Chapter 11 cases and minimize the disruption to the Debtors' business affairs (without violating the policies underlying the Bankruptcy Code). Accordingly, the Debtors request that they be authorized to use their existing Business Forms without being required to label each with the "debtor-in-possession" identifier.

    **c.    Request for Waiver of Section 345 Guidelines**

43. By this Motion, the Debtors seek a waiver of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code to permit the Debtors to maintain their existing Bank Accounts even though the operating account may, from time to time, exceed the amount insured by the FDIC and the NCUA limit.

44. The Debtors' account balances in excess of the FDIC and NCUA insurance limits are maintained at JP Morgan and First Jersey Credit Union respectively. Consequently, a waiver of the section 345 deposit guidelines pursuant to section 345(b) of the Bankruptcy Code would not pose a risk to the Debtors' estates or their creditors.

**D.    Debtors' Motion for Entry of an Order Directing Joint Administration of Debtors' Chapter 11 Cases**

45. The Debtors submit that, in light of their affiliated status and interrelated business operations (as described below), the joint handling of the administrative matters respecting these cases, including, without limitation, the use of a single docket for matters occurring in the administration of the estates and the combining of notices to creditors, will aid in expediting these chapter 11 cases and rendering their administration more efficient and economical.

## **CONCLUSION**

The Debtors respectfully requests that all of the First Day Orders be entered.

By: /s/ Chet Dunican
CHET DUNICAN,
CEO of the Debtors

Dated: June 17, 2010

F:\WPDOCS\N-Z\Woods Restoration Holdings, LLC\First Day Declaration of Chet Dunican.doc