**TRENK, DiPASQUALE, WEBSTER,**
**DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Sam Della Fera, Jr. (SD 4840)
Shoshana Schiff (SS 9639)
*Proposed Counsel for Debtors*
*and Debtors-in-Possession*

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>WRS HOLDINGS, LLC, *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 10-28457 (DHS)<br><br>*\*Motion for Joint Administration Pending*<br><br>Honorable Donald H. Steckroth |

### APPLICATION IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE INTERIM AND FINAL USE OF CASH COLLATERAL

TO:  THE HONORABLE DONALD H. STECKROTH
     UNITED STATES BANKRUPTCY JUDGE

WRS Holdings, LLC; WRS, LLC; Woods Restoration Services of Montclair, NJ, LLC; Woods Restoration Services, LLC; Woods Restoration Services of S.C., LLC; Environmental Remediation Concepts, LLC and WRS, Inc. (collectively, the "Debtors"), by and through their undersigned proposed counsel, hereby move before this Court (the "Motion") for entry of an interim and final order authorizing the Debtors' use of cash collateral pursuant to 11 U.S.C. §§ 105, 363(c)(2)(B), and 363(e), and Federal Rule of Bankruptcy Procedure 4001(b), and respectfully represents as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This is a "core" proceeding pursuant to 28 §§ 157(b)(2)(A) and (M).

## BACKGROUND

3. On June 16, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey. A motion for the joint administration of the Debtors' cases has been filed and is pending.

4. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or creditors' committee has been appointed in these cases.

### Business and Operations of the Debtor

5. For a description of the Debtors, their operations, and the events leading to the filing of their Chapter 11 cases, the Debtors respectfully refer to the Declaration of Chet Dunican in Support of First Day Applications and Motions filed concurrently herewith.

### MFC Capital Funding Loan

6. On or about November 18, 2005, Debtors obtained financing from MFC Capital Funding, Inc ("MFC") in the amount of up to $11,500,000. The arrangement provided funding from MFC to Debtors by three methods (collectively, the "MFC Loan Obligations").

7. The first method was referred to as Term Loan "A". Funding delivered under the terms and condition of Term Loan "A" provided for monthly payments of approximately

$66,667.00 per month with a final balloon payment becoming due and owing in November, 2010. There remains due and owing the amount of $333,315.00 on Term Loan "A".

8.  The second method was through Term Loan "B," an interest only loan with an annual payment of approximately $44,000.00 and a balloon payment of $1,664,049.00 due in November, 2010.

9.  The third method of funding was by way of a line of credit that could be accessed by the Debtors providing to MFC on a monthly basis a statement of accounts receivable less than 150 days old (the "Line of Credit"). Debtors' borrowing base would be 80% of that amount. Once the borrowing base was established for the month, Debtors simply requested funds be deposited in the designated J.P. Morgan Chase account, via letter to MFC. On the Petition Date the balance due and owing on the Line of Credit was $3,314,277.97.

10. Debtors granted security interests to MFC in substantially all assets, including accounts receivable, subject to purchase money security interests that were or became in place on purchased equipment, vehicles, etc. (collectively, the "MFC Collateral")

11. As set forth above, MFC has a secured claim in the approximate amount of $5,300,000. As of the Petition Date, the Debtors' balance sheet reflected assets, net of depreciation, in the amount of approximately $21,900,000.

## THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

12. The Debtors should be authorized to use the Cash Collateral in the ordinary course of its businesses and in accordance with the budget attached hereto as Exhibit "A" (the "Budget"), because MFC is adequately protected by the substantial excess equity in the value of the MFC Collateral.

13. It is in the best interests of the Debtors and their estates that the Debtors' operations continue. For that to occur, the Debtors must be authorized to use cash collateral. A hasty liquidation of the Debtors' assets is contrary to the best interests not only of the Debtors, but also of its creditors, both secured and unsecured.

**Legal Authority**

14. Pursuant to Bankruptcy Code section 363(a), cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents ..." and the proceeds thereof. Pursuant to 11 U.S.C. § 363(c) (2) and Bankruptcy Rule 4001(b), a debtor may not use cash collateral unless the entity that has an interest in such cash collateral consents, or until the Court authorizes the use of cash collateral after notice and a hearing, upon a finding that the interest of the secured party is adequately protected.

15. Bankruptcy Code section 363(c)(2) permits this Court to allow a debtor to use cash collateral so long as the debtor provides its secured creditors with adequate protection. "Adequate protection" is not defined in the Bankruptcy Code, although 11 U.S.C. section 361 sets forth three non-exclusive methods of how an interest in property may be adequately protected.

16. "Adequate protection" is aptly described as "a balancing of the debtor's and a creditor's respective harm." In re Carson, 34 B.R. 502, 505 (Bankr. D. Kan. 1983) (citation omitted). The legislative history to Bankruptcy Code section 361 reflects Congressional intent to give the Court flexibility to fashion adequate protection in light of the facts of each case and general equitable principles. In re 5-Leaf Cover Corp., 6 B.R. 463, 466 (Bankr. S.D.W.Va. 1980).

17. The "interest" of a secured creditor which is entitled to be protected is the value of the secured creditor's allowed secured claim; that is, the amount of the secured creditor's claim up to the value of the collateral upon which the secured creditor has a lien as of the relevant valuation date. In re Shriver, 33 B.R. 176, 181 (Bankr. N.D. Ohio 1983); In re South Village, Inc., 25 B.R. 987, 994 (Bankr. D. Utah 1982). The alleged secured creditor is only entitled to assurance that the value of its lien will not decrease as a result of the automatic stay and, if it does, that it will receive something as compensation for the decrease. In re Ramco Well Service, Inc., 32 B.R. 525, 531 (Bankr. W.D. Okla. 1983). Thus, where the value of the collateral is not declining, a debtor need not do anything for the secured creditor as it is adequately protected. Id.; accord, In re Price, 40 B.R. 578, 580 (Bankr. N.C. Tex. 1984).

18. An alternate view is that a secured creditor is adequately protected if it has an equity cushion, which means that the secured creditor's collateral is worth more than its debt. In re Pitts, 2 B.R. 476 (Bankr. C.D. Cal. 1979).

19. The Debtors hereby seek the preliminary and final use of cash collateral to preserve its assets so as to maintain and maximize their value for the benefit of all parties-in-interest. As is demonstrated below, under either or both theories of adequate protection, to wit, absence of diminution in value or equity cushion, MFC remains adequately protected notwithstanding the Debtors' use of the Cash Collateral.

20. A denial of the use of Cash Collateral to fund the Debtors' day-to-day operations would severely damage not only the Debtors, the Employees, and the Debtors' customers and vendors, but also the Debtors' other creditors. Further, the denial of the use of Cash Collateral, even for a short period of time, will cause immediate and irreparable harm to the reputation, goodwill, and public confidence of and in the Debtors, a consequence that can only result in a

drastic loss of value as a going concern. Finally, without the authority to use Cash Collateral, the Debtors cannot continue to operate. That will cause a loss of going concern value, and preclude the ability to reorganize, thereby preventing creditors from realizing upon reorganization value.

21. The Debtors have a real ability to reorganize within a reasonable period of time and make significant distribution to all of creditors. It is important to note that the Debtors had incurred <u>no payment defaults</u> under the MFC Loan Obligations.

22. The Debtors are prepared to discuss with their secured and unsecured creditors the development of both a financial and operational restructuring plan. The authority to use Cash Collateral will enable the Debtors to engage in those discussions and accomplish their reorganization, while operating in the ordinary course.

**<u>Secured Creditors are Adequately Protected</u>**

23. As set forth above, adequate protection is either the absence of diminution in value or the presence of an equity cushion. The value of the MFC Collateral appears to exceed the debt due to MFC by over 100 percent. Thus, on that basis alone, MFC is substantially oversecured and thus adequately protected.

<b><u>TIMING AND NOTICES</u></b>

24. The Debtors respectfully seeks a two-part hearing process. First, pursuant to Bankruptcy Rule 4001(b)(2), the Debtors seek a preliminary hearing on the use of Cash Collateral in accordance with the Budget on less than fifteen (15) days' notice. Second, the Debtors seek a final hearing on at least fifteen (15) days' notice. At a minimum, the Debtors proposes to give notice pursuant to Bankruptcy Rule 4001(b)(1) and (3) to the Office of the United States Trustee, all secured creditors, the top twenty (20) unsecured creditors, any other parties claiming an interest in the cash collateral, and any party who has requested notice.

25. No prior application for the same or similar relief has been made to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that the Court preliminarily and finally approve the Debtors' use of Cash Collateral, pursuant to the Budget, and in the ordinary course of business, and grant such other and further relief as the Court deems just and equitable.

          **TRENK, DiPASQUALE, WEBSTER, DELLA FERA & SODONO, P.C.**
          Proposed Counsel for Debtors

          By:  /s/ Sam Della Fera, Jr.
                 Sam Della Fera, Jr.

Dated: June 17, 2010

F:\WPDOCS\N-Z\Woods Restoration Services\CASH COLLATERAL - Application.doc

# EXHIBIT "A"

## WRS, LLC

### Budget 6/16/2010-6/28/2010

| Period | 6/16 – 6/18 | 6/19 – 6/28 |
|---|---|---|
| AR Collections | 30,000 | 35,000 |
| Deposits | - | - |
| Total In: | 30,000 | 35,000 |
| SG&A Expense | | |
| Kensay Assoc. (Rent) | 2,697 | - |
| Malasky (Rent) | 3,550 | - |
| Vacumet (NJ Office Rent) | 9,512 | 9,512 |
| Shirley Ventures DC (Rent) | 3,548 | - |
| AFLAC | 567 | - |
| AFLAC-CT | 293 | - |
| Horizon BC/BS | - | 17,000 |
| United Healthcare | - | 695 |
| Insurance Renewals | - | 42,000 |
| D&O Insurance Premium | - | 4,804 |
| Motor Vehicle Fuel | - | 18,000 |
| Truck Travel Expense | 2,500 | 2,500 |
| Vehicle Installment Loans | - | 6,500 |
| Sales Tax | - | 39,600 |
| Copier Leases | 502 | 502 |
| Utilities | 5,977 | 5,977 |
| Projects/Subcontractor Costs* | 30,000 | 35,000 |
| Gross Payroll Incl. all Taxes | - | 70,000 |
| Total Out: | 59,146 | 252,090 |

*Funding subcontractor work on revenue producing projects